SHAWNEE PEANUT CO. v. BARKUS.

No. 34578.     Oct. 2, 1951.

Rehearing Denied Sept. 9, 1952.

247 P. 2d 875.

B. F. Davis, J. A. Patterson, and Earl A. Davis, Wewoka, for plaintiff in error.

Allen G. Nichols and Walter Billingsley, Wewoka, and Ned R. Looney, Oklahoma City, for defendant in error.

O'NEAL, J. This is an appeal from a verdict and judgment in favor of defendant in error, Raymond Barkus. Raymond Barkus commenced this action in the district court of Seminole county against plaintiff in error, Shawnee Peanut Company, and Charles T. Hutson. The Shawnee Peanut Company is a copartnership composed of Jay Huffman and Jack Hammons, with its principal place of business in Shawnee, Pottawatomie county, Oklahoma. Jay Huffman and Jack Hammons are residents of Pottawatomie county and defendant Charles T. Hutson is a resident of Seminole county. The case was tried to a jury resulting in verdict and judgment in favor of the plaintiff, Raymond Barkus, and against the defendant Shawnee Peanut Company, and defendant Shawnee Peanut Company appeals. The jury returned a verdict in favor of defendant Charles T. Hutson.

Defendant Shawnee Peanut Company is and has been for several years engaged in the business of buying and processing peanuts. Plaintiff, Raymond Barkus, is a resident of Wewoka in Seminole county. In 1948, plaintiff owned a farm across the county line in Hughes county. In that year he planted about 70 or 75 acres of said farm in peanuts. Plaintiff's evidence is that about 15 acres of the land planted in peanuts is land termed as "black, or gumbo" soil, and the remainder is sandy land. There is some evidence on the part of the defendant tending to prove that all the land was gumbo soil. After plaintiff had plowed his peanuts he employed George Payne to thresh them. They threshed the peanuts grown on the black or gumbo soil first and placed them separate from the peanuts grown on the sandy soil.

Defendant Shawnee Peanut Company employs agents in various counties who are certified and approved by the Department of Agriculture to inspect and grade farmers' stock peanuts under the 1948 "Peanut Program" to buy peanuts for the account of defendant Shawnee Peanut Company. In the year 1948 defendant Charles T. Hutson was a certified and approved grader and was the agent of defendant Shawnee Peanut Company, in Seminole county. After the peanut crop was threshed plaintiff took two or three sacks of peanuts which were grown on the gumbo land to Leon Tipton, who was also a certified grader engaged in buying peanuts. The percentage of "foreign material" was so high that Tipton would not buy the peanuts, and Tipton advised plaintiff to rerun the peanuts through the thresher. Payne reran a few sacks through the thresher but that did not remove the foreign material and plaintiff decided to reclean the peanuts by hand. There were about 90 or 100 sacks of peanuts which were grown on the gumbo land. Plaintiff recleaned about 35 sacks of them. Plaintiff had also taken a sample of the peanuts to a grader and buyer in Holdenville. What grade he gave them is not shown. Plain-

tiff also took a sample of the peanuts to a grader and buyer, a Mr. Taylor at Wetumka, Oklahoma. Apparently Taylor gave a grade showing "Sound mature kernels 78%"; "Type 5"; "Small shrunken kernels 2%"; "Foreign materials 12%." The support price for that grade of peanuts was $229.50 per ton. Plaintiff decided not to sell to Taylor and took the samples back home. A few days thereafter defendant Charles T. Hutson learned that plaintiff had a crop of peanuts for sale and went to plaintiff's home and informed plaintiff that he would like to purchase plaintiff's peanuts. Plaintiff testified that he told Hutson that some of the peanuts were very bad; that he had had them tested and they ran pretty bad, and that plaintiff had decided to reclean them; that Hutson then asked plaintiff how many of such peanuts he had, and plaintiff told him "approximately 100 sacks." Hutson then asked plaintiff how long it would take to reclean them and plaintiff replied he did not know how long it would take, but that they would get through as soon as they could. Plaintiff testified further that the next day defendant Hutson came to plaintiff again and asked plaintiff if he was through cleaning the peanuts and plaintiff told him that he had about 60 sacks yet to be cleaned. The evidence is in conflict as to just what took place then. Plaintiff testified he told Hutson that if Hutson would take them as they were and "if so, we will go out there and I will let you look at them"; that they then went to the farm where they found the boys plaintiff had employed engaged in cleaning the peanuts; that plaintiff had all the peanuts, the whole crop, stacked in his barn; that plaintiff and defendant Hutson went into the barn and plaintiff showed Hutson the peanuts; that the peanuts grown on the gumbo land were stacked to one side and the clean ones which were grown on the sandy land were stacked on the other side of the barn; that plaintiff showed Hutson the sacks of peanuts which had not been recleaned, and that Hutson then replied, "if it is no more than that, I can take them"; that plaintiff replied "All right, Sir," and that Hutson then told plaintiff to stop the boys from cleaning and bring the peanuts into his place in Cromwell, Oklahoma; that thereupon plaintiff took his truck and hired two other trucks and hauled the peanuts into Cromwell, where they were weighed and delivered to Hutson; that thereupon defendant Hutson prepared what was denominated a "bill of sale and draft, statement of settlement of farmers stock peanuts."

The first part of the instrument, among other things, certified the gross weight of the peanuts, 55,065 pounds, and the net weight at 48,458 pounds, certified the per cent of foreign material 12%; per cent of sound mature kernels 78%; per cent of damage 0%; "support price per ton $229.50"; "Amount to be paid seller $5,560.55." The next part of the instrument, under the subtitle "Sellers Certificate" was as follows:

"I certify that (the producer of the peanuts described above received the full support price therefor) . . . (the peanuts described above were produced by me) . . . that said peanuts were produced during the calendar year. That said peanuts are free and clear of any and all liens and encumbrances except as listed herein; that no part of the purchase price of said peanuts has previously been received; and that the information shown on this document is true and complete. I hereby sell said peanuts to Shawnee Peanut Co., at the price shown on the draft below."

The next part of the instrument, under the head "draft," was as follows:

"On Demand not later than 90 days from date.

Date 10-8-1948

"Pay to the Order of Raymond Barkus . . . $5560.55 Five Thousand five hundred sixty & 55/100 DOLLARS (Presentment and demand for acceptance and payment, protest and notice of dishonor are waived.) When accepted this draft will be paid at par.

"Raymond Barkus, Seller * *
"P. O. Wewoka R.F.D. No.___
"County Seminole State Okla."

"To Shawnee Peanut Co.
"Shawnee, Oklahoma
"Payable through Federal
"National Bank.

Plaintiff testified that when he signed the draft it provided for payment, on demand not later than ten days from date, and that the word "ten" had been stricken and the figure "90" inserted after he signed same and sent it in for collection.

On the upper left margin of the instrument appears "Certificate of Inspector" as follows:

"I certify that the peanuts described in this document were inspected and found to be the type, foreign material content and grade as represented herein, determined in accordance with the rules and regulations prescribed by the U. S. Department of Agriculture.

"Signed Chas. T. Hutson,
(Inspector)"

On the lower left margin was a "Certificate of Receiving Agency" as follows:

"The undersigned hereby certifies that the peanuts described above have been purchased for the account of Shawnee Peanut Co., that the draft and statement set forth hereon are true and complete; that payment for said peanuts has not previously been made to or received by the Seller' or his assignee; that the undersigned holds said peanuts for the account of Shawnee Peanut Co. in accordance with the Designated Agency Contract above referred to in the warehouse indicated above, and said peanuts will be delivered, subject to the provisions of such contract.

"By Chas. T. Hutson
"(Agent of Shawnee Peanut Co.)"

After the entire crop of peanuts, about 675 sacks, were delivered to Hutson at Cromwell, Oklahoma, they were taken by defendants to their mill, or warehouse, in Shawnee, Oklahoma, the last truckload being delivered in Shawnee on Sunday morning, October 10, 1948.

It appears that defendant Shawnee Peanut Company notified Hutson that the peanuts were not up to the grade given by Hutson and that they declined to accept same; that Hutson called plaintiff about 1 o'clock p.m. on Sunday, October 10th, and informed him that Shawnee Peanut Company had declined to accept the peanuts and asked plaintiff to go to Shawnee and try to effect a settlement of the matter; that plaintiff did not go to Shawnee on Sunday, but on the next day, Monday morning, he went to Shawnee, and when he got there he found that Shawnee Peanut Company had about 50 sacks of peanuts in their warehouse which he identified as a part of the peanuts he sold to Hutson; that the other sacks were not there, and they had apparently been run through the mill, or commingled with other peanuts in defendant's warehouse; that plaintiff was informed that the Shawnee Peanut Company had refused to accept the draft and had turned it down. It further appeared that the Shawnee Peanut Company proposed a settlement with plaintiff at a greatly reduced price which he would not accept, and that the next day, on Tuesday, he again went to Shawnee in connection with the matter and took with him his attorney, Walter Billingsley. Plaintiff testified that when they arrived in Shawnee none of the peanuts were left in the warehouse. Plaintiff further testified that in the meantime Shawnee Peanut Company had J. D. Butner, another certified and approved grader, to regrade the peanuts, and that Butner had apparently regraded all the peanuts on the basis of the 50 or 55 sacks which had not been taken into the warehouse when plaintiff went to Shawnee on Monday. Butner graded them as follows:

"Sound mature kernels, 72%
"Small shriveled kernels, 2%
"Total damage 0%
"Type SWS;
"Foreign material, 42%
"Net 55,065 lbs.
"Foreign material
  deduction 23,127 lbs.

"Inweight,                        31,938 lbs.
"Support price,      $183.00 per ton.
"Minimum purchase
   price,                        $2,922.33."

Plaintiff did not accept that offer. He testified that he then told Shawnee Peanut Company to either pay him for the peanuts, or return them to him, and that defendant Shawnee Peanut Company did neither, and that plaintiff had never been paid anything for his peanuts, and that defendant Shawnee Peanut Company later offered him about $1,400 which he declined to accept.

Thereupon this suit was commenced to recover the full purchase price $5,560.55.

Defendant Shawnee Peanut Company filed a special appearance and motion to quash the summons served on said defendant, and a plea to the jurisdiction of the court. The motion to quash was upon the ground that said summons was not issued, served and returned in the manner provided by law. The objection to the jurisdiction of the court was upon the ground that defendant is a resident of Pottawatomie county, Oklahoma, and had its place of business in said county, and that the cause is transitory, and service of said defendant in Pottawatomie county does not give the court jurisdiction of said defendant. The motion to quash and plea to the jurisdiction of the court by defendant Shawnee Peanut Company were overruled and said defendant was given ten days to plead, or 20 days to answer. Thereafter, and within the ten days, defendant Shawnee Peanut Company filed a demurrer to the petition of plaintiff upon the ground that:

" . . . the allegations in said petition, together with all inferences reasonably to be drawn therefrom, fail to state a cause of action in favor of said plaintiff and against said defendant. This pleading is filed pursuant to order of the court overruling the plea of defendant to the jurisdiction of the court, and defendant does not waive the plea to the jurisdiction of the court in this case by reason of filing this pleading."

Defendant Hutson filed a like demurrer. The demurrer of the Shawnee Peanut Company was overruled and thereafter said defendant filed its separate answer, consisting of a general denial of the allegations in the petition, except such as were specifically admitted, and further affirmative allegations that defendant Charles T. Hutson was certified and approved by the United States Department of Agriculture, Production and Marketing Administration, Fats and Oils Branch, Peanut Division, to inspect and grade farmers' stock peanuts under the 1948 "Peanut Program"; that a book of blank drafts was delivered to said Charles T. Hutson by defendant Shawnee Peanut Company, with oral instructions that Hutson should grade peanuts at Cromwell, Oklahoma, and in so grading he was to follow the regular government schedule and procedure of grading; that said Charles T. Hutson was authorized to prepare drafts for the signature of peanut growers selling peanuts to defendant Shawnee Peanut Company, and peanuts covered by such drafts were to be delivered by the grower at Cromwell, Oklahoma, from where they were to be transferred by defendant to its plant in Shawnee, Oklahoma, and that it was expressly understood that each individual purchase of peanuts was subject to grading and examination by defendant at its plant in Shawnee and approval of the peanuts covered by each draft was a condition precedent in each case to acceptance of the draft drawn by the seller of the peanuts, and that said Charles T. Hutson was to receive a commission of $4 per ton for all peanuts accepted by defendant, and that said Charles T. Hutson had no further authority or agency from defendant to act for or represent this defendant. The answer then pleaded the draft above mentioned, with a copy thereof attached to the answer, and further alleged that said draft was drawn to cover the selling price of 55,065 pounds of Spanish farmers stock peanuts, graded 78% sound mature kernels, with 12% foreign material, and 2%

small shriveled kernel at the price of $229.50 per ton for this grade of peanuts. The answer further alleged that when the peanuts were received at defendant's plant in Shawnee samples were taken and grades in accordance with the requirements of the United State Department of Agriculture were made, and said peanuts were found to contain 68% of foreign material, instead of 12% as represented by plaintiff, and 68.5% sound mature kernels instead of 78%, and that the price of peanuts of that grade was $149.50 per ton, instead of $229.50 per ton; that defendant forthwith notified plaintiff that said peanuts would not be accepted, and that the draft would not be accepted and that payment of said draft was refused. The answer then alleged that said defendant tendered plaintiff the correct value of the peanuts delivered in the sum of $1,440.65, and tendered and offered to pay plaintiff the value of said peanuts, as above stated. The answer then pleads the seller's certificate on said draft which, in part, reads:

"I certify that . . . no part of the purchase price of said peanuts has previously been received; and that the information shown on this document is true and correct. I hereby sell said peanuts to Shawnee Peanut Company at the price shown on the draft below."

The answer further alleged that said provision constitutes an express warranty by the plaintiff that the peanuts so sold to defendant should conform to the grade, specification and weight stated in said draft, and that failure to deliver peanuts as described in said draft constitutes a breach of warranty, and that by reason of said breach of warranty defendant is liable to plaintiff for the actual value of the peanuts delivered in the sum of $1,440.65; that defendant rescinded and now rescinds the sale of said peanuts as specified in the draft, and admits liability only for the actual value of the peanuts received in the amount above stated. The answer further alleged, in substance, that plaintiff has practiced fraud upon defendant Hutson, in representing to

him that all of his crop of peanuts were the same as the samples which he had shown to Hutson. The prayer was:

"Wherefore, this defendant having fully answered, prays that the plaintiff take from this defendant only the sum of $1440.65; and that the costs of this action be borne by the plaintiff; and that this defendant have all other relief to which it may be entitled in law or in equity."

Defendant Charles T. Hutson filed his answer consisting of a general denial and the further allegation that he was the special agent of the said Shawnee Peanut Company with limited authority to purchase peanuts for their account at Cromwell, Oklahoma. Plaintiff filed a motion to require the defendant Hutson to make his answer more definite and certain, but it does not appear that the court ever passed on that motion. Plaintiff replied to the separate answers, and the issues as thus joined were tried to a jury, resulting in the verdict and judgment, as above stated.

Shawnee Peanut Company first contends that the trial court was without jurisdiction of the Shawnee Peanut Company, or its individual members, for the reason that this is a transitory action, and that said defendant copartnership and the individual members thereof are and were at the time of the bringing of this action residents of Pottawatomie county, Oklahoma, and were served with summons in that county, and that the venue was not properly laid in the trial court, and that naming Charles T. Hutson, a resident of Seminole county, as party defendant did not, in this case, give the trial court jurisdiction of the Shawnee Peanut Company. In this connection defendant Shawnee Peanut Company cites the statute prescribing the venue of actions of certain cases, 12 O. S. 1941, c. 5, §139, which, in part, provides:

"Every other action must be brought in the county in which the defendant or some one of the defendants resides or may be summoned;"

Defendant also cites Parker v. Remy, 202 Okla. 400, 214 P. 2d 243, wherein it is held:

"Statutes permitting a defendant to have certain actions tried in the county where he resides are remedial in nature and are liberally construed, to the end that a defendant may not be unjustly deprived of that right. Exceptions authorizing the bringing of certain suits in a county other than that of the defendant's residence are to be strictly construed. It will not be assumed that the Legislature intended to impair that right unless it has manifested intention to do so plainly and unequivocally."

See, also, First National Bank of Seminole v. Henshaw, 169 Okla. 49, 35 P. 2d 898; Hixon v. Chamberlin, 116 Okla. 77, 243 P. 183; Grady v. Rice, 98 Okla. 166, 224 P. 321, and Brenner v. Egly, 23 Kan. 83.

Defendant in error, plaintiff below, asserts that Shawnee Peanut Company waived the alleged defect in the service of summons and entered its general appearance by any one of "seven distinct Acts."

"(1) By filing the demurrer wherein it contested the sufficiency of the petition on its merits.

"(2) By filing a verified answer seeking for affirmative relief by way of offset or counterclaim based upon damages for breach of warranty.

"(3) By filing an answer wherein it pleads and asks for rescission of contract and seeks to be relieved from the contract because of alleged fraud practiced upon defendant by plaintiff.

"(4) By its renewal of its tender in open court after the jury was impanelled and sworn, and in the presence of the jury in the sum of $1,440.65.

"(5) By presenting its motion for an instructed verdict in open court and in the presence of the jury.

"(6) By presenting certain requested instructions based upon the theory of the cases set forth in its answer, and

"(7) By setting up in its motion for a new trial as alleged error, refusal of the court to direct a verdict for defendant."

Defendant in error cites a number of cases wherein it was held that demurring generally to a declaration, complaint, or petition, constitutes a general appearance and waives all defects in service of process. But that rule does not apply where the defendant files a special appearance and objection to the service of summons and raises no other question therein, and the objection is overruled and exceptions are saved. In such case a defendant does not lose the right to have the overruling of his objections reviewed on appeal by afterward pleading the merits and going to trial, and upon general verdict presenting motion for new trial wherein jurisdictional and nonjurisdictional matters are united.

Kansas, O. & G. R. Co. v. Smith, 190 Okla. 103, 125 P. 2d 180. Therein it is held:

"Where defendant, after objection to jurisdiction over his person raised on special appearance has been overruled, demurs or pleads to the merits and goes to trial, he does not thereby lose the benefit of his special appearance and attack on the jurisdiction, if exceptions to the order overruling objection to the jurisdiction were properly saved."

In Myers v. Chamness, 102 Okla. 131, 228 P. 988, it is held that it is unnecessary for a motion to vacate a judgment based on extrinsic evidence of no service of process and unauthorized appearance, to show a meritorious defense to plaintiff's action; and that a party cannot seek the vacation of a judgment for fraud practiced by the successful party in obtaining same without subjecting himself to the jurisdiction of the court.

So, a defendant may, by coupling with the purely jurisdictional question of no service of process and unauthorized appearance the nonjurisdictional question of fraud practiced by the successful party in obtaining the same, submit himself to the jurisdiction of the

court for all purposes and thereby lose the right to have the judgment vacated.

Under the rule stated in Kansas, O. & G. R. Co. v. Smith, supra, defendant did not waive the defects, if any, in the issuance of service of summons by the filing of the general demurrer to the petition after presentation and overruling of his motion to quash service of summons based solely on jurisdictional grounds.

But it does not necessarily follow that defendant Shawnee Peanut Company did not subsequently enter a general appearance so as to waive the alleged defects in the service of process.

In paragraph 8 of defendant's answer, it is alleged:

"For further answer this defendant alleges that the provision of the draft sued on in this action, which is copied in the last preceding paragraph, constitutes an express warranty by the plaintiff that the peanuts sold to this defendant should conform to grade and specifications and weight stated in said draft, that failure to deliver peanuts as described in said draft constitutes a breach of said warranty, and that by reason of said breach of warranty this defendant is liable to plaintiff for only the actual value of the peanuts delivered by plaintiff in the sum of $1,440.65 instead of the amount of the draft drawn by plaintiff; and this defendant has rescinded and now rescinds the sale of said peanuts as specified in said draft and admits liability only for the actual value of the peanuts reeived in the amount above stated."

It may be noted that, in said paragraph 8 of defendant's answer, it is alleged that the provisions of the draft constitute an express warranty by the plaintiff that the peanuts sold to defendant should conform to grade and specification and weight stated in the draft, and that failure to deliver peanuts as described in said draft constituted a breach of said warranty. It is then alleged: "And this defendant has rescinded and now rescinds the sale of said peanuts as specified in said draft and admits liability only for the actual

value of the peanuts received in the amount above stated" ($1,440.65). In effect, defendant seeks a judgment or decree of the court to the effect that defendant had a valid contract of purchase of the peanuts with an express warranty of plaintiff that the peanuts so sold to defendant should conform to the grade, specification and weight stated in the draft; that plaintiff breached said warranty and because of such breach of warranty defendant "rescinded and now rescinds the sale of said peanuts as specified in said draft. * * *"

It may here be noted that defendant's plea of rescission is wholly insufficient because there was no return or offer to return of the peanuts to plaintiff.

"Where a defense rests on a rescission or abandonment of a contract, the issue is whether the contract has ceased to have legal existence or has been terminated by reason of events occurring subsequent to its inception. It is a distinct and substantive ground of defense by way of confession and avoidance, and the defendant, if he wishes to avail himself of it, must specially plead it." 41 Am. Jur., Pleadings, §159, p. 404.

The court could not adjudge and decree that defendant had a valid contract of purchase with the express warranty contended for unless and until the court had jurisdiction of the subject matter, and jurisdiction of the person of defendant. In the very nature of the proceedings defendant could not seek and obtain a decree that it had a valid contract of purchase, including the express warranty as to the truth of the statements in the draft as to the grade of the peanuts, without first submitting himself to the jurisdiction of the court. Myers v. Chamness, supra. It is unnecessary to consider any of the other alleged acts by which plaintiff contends that defendant entered its general appearance.

Judgment is affirmed.

CORN, GIBSON, JOHNSON, and BINGAMAN, JJ., concur. HALLEY, V.C.J., dissents.